UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Tom Lundeen, individually, and Nanette Lundeen, individually, and Tom Lundeen and Nanette Lundeen on behalf of, and as parents and natural guardians of Molly Lundeen, a minor, and Michael Lundeen,<br><br>Plaintiffs,<br><br>v.<br><br>Canadian Pacific Railway Company, Canadian Pacific Limited, Canadian Pacific Railway Limited and Soo Line Railroad Company,<br><br>Defendants. | **Court File No.** 04.3220 RHK/AJB<br><br><br>**NOTICE OF REMOVAL** |

TO:     Plaintiffs Tom Lundeen, Nanette Lundeen, Molly Lundeen, and Michael Lundeen and their Attorneys Collin P. Dobrovolny, Bryan L. Van Grinsven, McGee, Hankla, Backes & Dobrovolny, P.C., 15 2nd Avenue SW – Wells Fargo Bank Center, P.O. Box 998, Minot, North Dakota 58702.

Defendants Canadian Pacific Railway Company, Canadian Pacific Limited, Canadian Pacific Railway Limited and Soo Line Railroad Company ("CP"), by its attorneys and pursuant to 28 U.S.C. § 1441(a) and (b), submits this Notice of Removal to remove the civil action now pending in the District Court of the Fourth Judicial District, Hennepin County, Minnesota. In support of this Notice of Removal, CP states:

1.     CP is the defendant in an action pending in the District Court for the Fourth Judicial District, Hennepin County, Minnesota, captioned *Dion Darveaux, et al. v. Canadian Pacific Railway Company, et al.*, No. PI-04-9933.

SCANNED
JUL 1 6 2004
U.S. DISTRICT COURT ST. PAUL

2.     Plaintiffs served CP with a Summons and Complaint for this action on July 1, 2004. A copy of the Summons and Complaint is attached to this Notice of Removal as Exhibit A. This Notice of Removal is being filed within 30 days of receipt of Plaintiffs' Complaint and is therefore timely under 28 U.S.C. § 1446(b).

3.     Pursuant to 28 U.S.C. § 1441(a), the United States District Court for the District of Minnesota is the federal District Court for the District embracing the place where the action is pending.

## FEDERAL QUESTION JURISDICTION

4.     This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 because Plaintiffs have brought claims arising under federal law. *See* Exhibit A, ¶ XXVII ("Defendant CPR failed to comply with applicable rules, regulations, standards, guidelines and practices including, but not limited to, rules and regulations of the Federal Railroad Administration, applicable provisions of the Code of Federal Regulations . . . ."), Count Three, ¶ V ("The Defendant CPR violated applicable state law, both North Dakota and Minnesota, as well as United States law . . . .") (emphasis added).

5.     CP reserves the right to amend or supplement this Notice of Removal.

6.     CP has not been served with any other process, papers, orders, or other pleadings in this action.

7.     CP, by its attorneys, has served by mail a written notice of the filing of this Notice of Removal to counsel for Plaintiffs and will cause a copy of this Notice of Removal to be filed with the Clerk of the District Court of the Fourth Judicial District, Hennepin County, Minnesota, as required by 28 U.S.C. § 1446(d).

WHEREFORE, CP removes to this Court the above-referenced action now pending in the Fourth Judicial District, Hennepin County, Minnesota.

**BRIGGS AND MORGAN, P.A.**

Date: July 15, 2004

By: _____
Timothy R. Thornton (MN #109630)
Scott G. Knudson (MN #141987)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400

**ATTORNEYS FOR DEFENDANTS**

# EXHIBIT A

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| Tom Lundeen, individually, and Nanette Lundeen, individually, and Tom Lundeen and Nanette Lundeen on behalf of, and as parents and natural guardians of Molly Lundeen, a minor, and Michael Lundeen, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Court File No._____ Case Type:  Personal Injury |
| -vs- | ) ) ) | **SUMMONS** |
| Canadian Pacific Railway Company, Canadian Pacific Limited, Canadian Pacific Railway Limited and Soo Line Railroad Company, | ) ) ) ) ) | |
| Defendants. | ) ) | |

THE STATE OF MINNESOTA TO THE ABOVE NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED and required to serve upon Plaintiffs' attorney an Answer to the Complaint, which is herewith served upon you, within twenty (20) days after the service of this Summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

PARTIES ARE REQUIRED TO ATTEMPT ALTERNATIVE DISPUTE RESOLUTION UNDER MINNESOTA LAW.  ALTERNATIVE DISPUTE RESOLUTION INCLUDES MEDIATION, ARBITRATION, AND OTHER PROCESSES SET FORTH IN THE DISTRICT COURT RULES.  YOU MAY CONTACT THE COURT ADMINISTRATOR ABOUT RESOURCES IN YOUR AREA.

1

Dated this 28th day of June, 2004.

BY: _____
Collin P. Dobrovolny (ND License #03295)

_____
Bryan L. Van Grinsven (ND License #05357
And MN License #0261312)

MCGEE, HANKLA, BACKES &
DOBROVOLNY, P.C.,
15 2nd Avenue SW – Wells Fargo Bank Center
PO Box 998
Minot, ND  58702-0998
Telephone No. (701) 852-2544
ATTORNEYS FOR PLAINTIFFS

2

STATE OF MINNESOTA                          DISTRICT COURT

COUNTY OF HENNEPIN                    FOURTH JUDICIAL DISTRICT

| | |
|---|---|
| Tom Lundeen, individually, and )<br>Nanette Lundeen, individually, and Tom )<br>Lundeen and Nanette Lundeen on behalf )<br>of, and as parents and natural guardians of )<br>Molly Lundeen, a minor, and Michael )<br>Lundeen, )<br>          Plaintiffs, )<br>)<br>  -vs- )<br>)<br>Canadian Pacific Railway Company, )<br>Canadian Pacific Limited, Canadian )<br>Pacific Railway Limited and Soo Line )<br>Railroad Company, )<br>)<br>         Defendants. ) | Court File No._____<br>Case Type: Personal Injury<br><br>**COMPLAINT**<br>**AND DEMAND**<br>**FOR JURY TRIAL** |

COMES NOW the Plaintiffs and bring this action for personal injury and property

damage against the Defendants, and in furtherance of these claims, allege and state as

follows:

I.

The Plaintiffs are Tom Lundeen, individually, and Nanette Lundeen, individually, and

Tom Lundeen and Nanette Lundeen, on behalf of and as parents and natural guardians of

Molly Lundeen, a minor, and Michael Lundeen, who was a minor at the time, who all

resided at 716 36th Street S.W., Minot, North Dakota on January 18, 2002, and assert that

they were injured and damaged in their person and property on that date as a result of

actions or inactions by the Defendants.

1

II.

Defendant, Soo Line Railroad Company is a corporation duly organized and existing under the laws of the state of Minnesota with its principal place of business located at 501 Marquette Avenue, Minneapolis, Minnesota.

III.

Defendant, Soo Line Railroad Company is a wholly-owned subsidiary of Defendant, Canadian Pacific Railway Company which, in turn, is a wholly-owned subsidiary of Defendant, Canadian Pacific Limited.   Defendant, Canadian Pacific Railway Limited, is a Canadian corporation and a related company to the other Defendants.  All of these Defendants did business in the state of Minnesota at relevant times to this cause of action.  Defendants, Canadian Pacific Railway Company, Canadian Pacific Limited, Canadian Pacific Railway Limited, and Soo Line Railroad Company were all related companies and bear the responsibility and fault for the train derailment subsequently described in paragraph VIII.   These Defendants shall be hereinafter collectively referred to as "Defendant CPR."

IV.

Defendant CPR  is a duly licensed railroad in the United States and authorized to operate a system of railroads as a common carrier of freight in and through the states of North Dakota and Minnesota and including Hennepin County, Minnesota, as well as in other states in the United States of America and in Canada.

V.

Defendant CPR is subject to the rules, regulations, governance and obligated to comply with all regulations of the United States of America including the Federal Railroad Administration (FRA) and subject to, among other obligations, compliance with

2

FRA regulations and the Code of Federal Regulations (CFR) and all other regulations of the states of North Dakota and Minnesota and the United States of America for the operation of a railroad.

VI.

Defendant CPR is subject to the jurisdiction of this court in that the headquarters of Defendant CPR in the United States is located in Hennepin County, Minnesota, and critical decisions made by Defendant CPR were made in Hennepin County, Minnesota, including management decisions concerning track installation, track maintenance, assignment of personnel, allocation of resources, train operations, regulatory compliance and all manner of decisions affecting equipment, operations and resources of Defendant CPR.

VII.

Defendant CPR operates a railway that extends from beyond Medicine Hat, Alberta, Canada, to beyond St. Paul, Minnesota, and which runs northwest to southeast through the state of North Dakota. The track in North Dakota is part of the St. Paul Service Area. That portion of the track in the St. Paul Service Area in northwestern North Dakota is denoted as the Portal Subdivision. That portion of the track in the Portal Subdivision from approximately Kenmare, North Dakota, to approximately Minot, North Dakota, is denoted as the Kenmare Section. The derailment described in paragraph VIII occurred in the St. Paul Service Area, Portal Subdivision, Kenmare Section of Defendant CPR's main line track.

VIII.

At approximately 1:37 A.M. on January 18, 2002, an eastbound CPR freight train, designated 292-16, traveling about 41 miles per hour, derailed 31 of its 112 cars

3

approximately one-half mile west of the city limits of Minot, North Dakota, at a location designated as MP 471.65. Five tank cars containing liquefied anhydrous ammonia catastrophically ruptured, instantaneously releasing approximately 146,700 gallons of anhydrous ammonia. Seven pressurized tank cars were damaged, which subsequently lost some or all of their contents, resulting in an additional release of approximately 74,000 gallons of liquefied anhydrous ammonia, for a total release of anhydrous ammonia of approximately 221,000 gallons. This incident shall hereinafter be referred to as the "Minot Derailment."

IX.

At all times relevant to the Minot Derailment, the train, track, ballast, sub-ballast, lading, equipment, maintenance, operations and personnel were all under the governance, supervision, administration and control of Defendant CPR, but subject to regulatory provisions of state and federal law.

X.

The tracks at the location of the Minot Derailment were classified as FRA Class 3 Track with a maximum speed limit for freight trains of 40 miles per hour, subject to a lower but not higher speed by regulation or CPR order. The CPR train designated 292-16 was travelling in excess of the authorized track speed at the time and location of the Minot Derailment, in excess of a reasonable speed for conditions at the time of the Minot Derailment, and in excess of a proper speed by regulation.

XI.

The tracks in the Kenmare Section were represented and contended to be continuous welded rail, a designation which purports to be and represents a claim that the rail is without joints, splices or plugs. In fact, at the time of the Minot Derailment

4

between mile post 471 and 472, there were ten or more joints representing five or more plugs, which did not meet the definition of continuous welded rail and which, in turn, affects authorized and reasonable speed of trains. Joints are, and it is well known to Defendant CPR, much weaker and more prone to failure than continuous welded rail.

### XII.

The track at the time and place of the Minot Derailment was 100-pound rail, which is the lightest weight rail in use in the Defendant CPR's rail system. Defendant CPR has over 14,000 miles of track in its system with only 65 miles of 100-pound rail on its main line track. The entire 65 miles of 100-pound rail in CPR's rail system is found in North Dakota and two-thirds of it is located in the Kenmare Section, the remainder being in the adjoining section southeast of the Kenmare Section. 100-pound rail is considered lightweight rail not suitable for use on main lines that bear the amount of traffic experienced by the track in question. The Defendant CPR has increased track usage from approximately fifteen million tons per year in 1992 to twenty-five million tons per year, and this increased traffic heightens and increases the probabilities of failure, particularly with the 100-pound lightweight rail.

### XIII.

The track at the time and place of the Minot Derailment was installed in 1973, but was not new at the time of its installation, having been salvaged from another location believed to be in Wisconsin. The rail had been manufactured sometime in the 1950's—making it nearly fifty years old. Further, the rail was worn, brittle and problematic. As a result, the rail required frequent repairs as defects were discovered, which Defendant CPR chose to repair by installing plugs, creating two joints per plug instead of welding. The height of the plugs used by Defendant CPR do not match the height of the existing

5

worn rail which, in turn, puts additional stresses on the joints and increases the probability, if not likelihood, of catastrophic derailments.  Plugs are far less safe than welding but less expensive to CPR.  CPR knew plugs were less safe but chose them to save money.

XIV.

Defendant CPR is aware of and acknowledges that rail containing joints is more likely to have separations, gaps, pull-aparts, breaks or other failures during extremely cold weather.  Yet, during these times Defendant CPR furloughed track maintenance workers and declined to perform normal track maintenance, walking inspections or other inspections designed to determine the presence of problems at joints, including (but not limited to) cracked or broken joint bars, bent or loose bolts, rail end batter and other clear indications of problems likely to result in catastrophic derailments.

XV.

Defendant CPR has conducted a systematic and planned reduction in force, including reducing personnel intended to maintain and service its main line track in North Dakota. CPR further designated work to the remaining maintenance personnel in such a way as to prevent or severely curtail welding of temporary joints. Defendant CPR further discontinued the use of inspection and ultrasonic testing devices which had, as their purpose, the identification of cracked or broken joint bars.  The use of such inspection and testing devices had been implemented by CPR following the hereinafter described Burlington Derailment which occurred in 1994, and which was caused by the same negligent acts or omissions as those that caused the Minot Derailment.

6

XVI.

Defendant CPR had adopted standards and practices for its track, track maintenance, equipment and other matters relating to the main line track effective for the time and place of the Minot Derailment. Defendant CPR failed to adequately train, inform, test or otherwise implement and verify that its practices and procedures had been learned and implemented by its personnel prior to the Minot Derailment.

XVII.

The Minot Derailment was caused by an ineffective and inadequate inspection and maintenance program by Defendant CPR. CPR's inspection and maintenance program failed to identify or replace cracked joint bars before those joint bars completely fractured. This cracking led to a rail separation, causing CPR train designated 292-16 to derail which, in turn, caused the failure of pressurized tank cars releasing 221,000 gallons of anhydrous ammonia, which blanketed the area adjacent to the tracks and engulfed many homes in the Minot and Minot area.

XVIII.

The Minot Derailment was caused by two broken joint bars at a joint located at mile post 471.65 in Defendant CPR's Kenmare Section which was designated by its configuration as a "temporary" joint. The broken joint bars were installed in the north rail at milepost 471.65 in May of 2000. Joints designated as temporary should be welded as soon as practical, but certainly within thirty days of installing the joint bars. CPR failed to weld the temporary joint for more than 20 months following its installation.

XIX.

The joint that failed and led to the Minot Derailment was repaired by CPR in the summer of 2001 when it was discovered that there were loose, bent or otherwise

7

damaged bolts and nuts. Loose, damaged, bent or broken nuts and bolts are indicia of rail stress which, in turn, are indicia of likely or imminent failure of a joint, requiring prompt, if not immediate, welding of the rail and, in the interim, a reduction in speed to decrease the probability of a catastrophic derailment. CPR failed to weld the temporary joint for more than six months following its repair and failed to reduce train speed.

### XX.

The nuts and bolts at joints, whether temporary or permanent, are required to be torqued to 550-foot pounds. The nuts and bolts at mile post 471.65 were removed following the derailment and found to be 54-foot pounds, 126-foot pounds, 205-foot pounds and 402- foot pounds, all of which are far below the specification of 550-foot pounds for rail joint nuts and bolts and that loose nuts and bolts results in additional stresses on railed joints and which, in turn, lead to joint bar failure and resulting derailments.

### XXI.

CPR has acknowledged that nuts and bolts are installed using pneumatic torque wrenches which are supposedly pre-set to 550-foot pounds. CPR, however, acknowledges that it does not check, reset, or otherwise verify that its torque wrenches are property set. CPR further acknowledges that occasionally nuts and bolts are installed, reinstalled or serviced using hand tools which do not measure torque, making it impossible to know whether the nuts and bolts are properly torqued.

### XXII.

The bolts comprising the joint at mile post 471.65 showed evidence of fretting and were bent, indicative of stress on the joint in the form of longitudinal forces that cause or contribute to joint bar failure and resulting derailments.

8

XXIII.

The east end of the plug and the west end of the rail at mile post 471.65 both showed evidence of batter far in excess of that permitted by Defendant CPR and far in excess of what is reasonable.  Specifically, batter was not to exceed .015 inches and at the time of the derailment was between .06 and .19 inches, which is between four times and fourteen times the amount of batter that should cause Defendant CPR to weld the joint into solid rail and which is further indicative of joint stress as well as likely or imminent joint failure and resulting derailments.  CPR acknowledges that, notwithstanding this requirement, it failed to measure rail end batter and failed to provide necessary but basic devices to its inspectors for measuring batter

XXIV.

Rail end batter at joints to the degree found following the Minot Derailment develops over time.  Therefore, the joint problems were evident for some time prior to the Minot Derailment.

XXV.

Defendant CPR's standards and practices require that adjoining rail and plugs must be fully box anchored at every tie for 195 feet from each joint.  The joint at mile post 471.65 was anchored only at every other tie and the old anchors were reinstalled following the insertion of the plug rather than installing new anchors.  Anchors are intended to minimize longitudinal stresses and movement of the track and the installation of only one-half of the number of anchors necessary make more likely, if not inevitable, the failure of the joint and resulting derailments.

9

XXVI.

Defendant CPR failed to comply with applicable rules, regulations, standards, guidelines and practices including, but not limited to, rules and regulations of the Federal Railroad Administration, applicable provisions of the Code of Federal Regulations, Defendant CPR's own standard practice circulars and industry wide standards. These violations were as the result of and under the direction of the Defendant CPR's management and were developed, examined, reviewed, implemented, or not, as the case may be, by management of Defendant CPR in Hennepin County, Minnesota with full knowledge that its equipment and personnel were placed in the impossible situation of trying to maintain safe track and train operations with woefully inadequate resources and commitment and that as a consequence, derailments were likely, if not inevitable.

XXVII.

On February 27, 1994, a derailment occurred on Defendant CPR's main line at mile post 477.1, which is approximately 5.5 miles west of the Minot Derailment on the same main line track and also in the Kenmare Section. The February 27, 1994, derailment resulted in a tanker car containing liquid butane bursting into flames and causing serious, permanent, devastating burn injuries to a then 16-year-old boy, and for which Defendant CPR compensated that 16-year-old boy. This derailment shall herein be referred to as the "Burlington Derailment."

XXVIII.

The Burlington Derailment, like the Minot Derailment, was caused by undiscovered fractured joint bars, inadequate inspection, inadequate repair and essentially the same causes as the Minot Derailment.

10

XXIX.

Investigation of the Minot Derailment concluded numerous irregularities and defective conditions were known prior to, and after, the Burlington Derailment, and certainly before the Minot Derailment. Said deficiencies and irregularities are identical or very similar to the deficiencies and irregularities that caused the Minot Derailment. As a result, Defendant CPR knew or should have known well the consequences of such deficiencies and irregularities as evidenced by the catastrophic injuries to the 16-year-old boy in the Burlington Derailment.

XXX.

Subsequent to the Burlington Derailment, Defendant CPR instituted a program of welding joints in the Kenmare Section into continuous welded rail. Defendant CPR then discontinued that welding program and, as a result, numerous joints existed in the Kenmare Section and including at least ten joints between mile post 471 and 472 at the time of the Minot Derailment.

XXXI.

Following the Burlington Derailment, Defendant CPR instituted a procedure where hand-held ultrasonic devices were used to identify cracked or broken joint bars. The ultrasonic testing of joint bars was discontinued sometime prior to the Minot Derailment, while at the same time Defendant CPR continued to install additional plugs. Other than walking inspections and ultrasonic testing of joint bars, there is no effective means for inspecting joint bars for cracks and failures. The inspection system used by Defendant CPR at the time of the Minot Derailment and for many years before, was ineffectual, unreliable and known by Defendant CPR to be such. Notwithstanding that

11

information, Defendant CPR failed to implement an effective means of inspection and/or testing of joint bars and elimination of joints in a timely manner by welding.

### XXXII.

Prior to the Minot Derailment, Defendant CPR suffered a derailment in 1988 near Bordulac, North Dakota, on the same main line track, which resulted in a derailment of tank cars carrying anhydrous ammonia.  This derailment caused the release of large quantities of anhydrous ammonia in a rural area and resultant contamination of air and soil.

### XXXIII.

Defendant CPR has experienced three derailments on its main line in North Dakota, each resulting in catastrophic failure of pressurized tank cars, and the release of hazardous and toxic chemicals with resultant serious personal injury and property damage.  Yet, it failed to adequately inspect and maintain its track in a conscious disregard to public health and safety with known disastrous consequences and with little or no apparent concern for public safety or property, putting profits ahead of and in place of public safety.

### XXXIV.

Defendant CPR, following the Burlington Derailment, reduced its train speeds from 40 miles per hour to 25 miles per hour in the Kenmare Section.  Subsequently, in 1998, Defendant CPR eliminated the joints in the main line by welding.  Thereafter, Defendant CPR increased the speed of its trains to 40 miles per hour.  The increase in speed revealed numerous defects which, in turn, resulted in the insertion of numerous plugs into the main line.  At the same time, Defendant CPR decreased welding of joints and discontinued ultrasonic testing which, in turn, created the same situation that existed

12

at the time of the Burlington Derailment, thereby making it inevitable that a subsequent catastrophic derailment would occur again. Even so, Defendant CPR continued to maintain its speed at 40 miles per hour with full knowledge of the risk of catastrophic consequences and that a derailment was almost certain.

### XXXV.

The area of the Minot Derailment is "dark territory" which is track that has no system for automatically notifying or warning Defendant CPR if there is a pull-apart, break in the line or other problem. Defendant CPR has "signal territory" for most, if not all, of its other track. Track in "signal territory" which provides an automatic warning of track separation or failure. By failing to provide signal in the area where the Minot Derailment occurred while, at the same time, reducing manpower, using 100-pound rail, reducing maintenance crews, reducing equipment, reducing inspections, increasing speed, installing numerous temporary joints, reducing welding of joints, eliminating ultrasonic testing, diverting manpower and resources to less critical purposes, and otherwise simply ignoring public safety and good operating practices, Defendant CPR created an unreasonable risk of derailments and resulting injuries and damages.

### XXXVI.

Defendant CPR made conscious and deliberate choices and in disregard of known hazards and dangers with known consequences of catastrophic derailments and the resulting likelihood of death, severe personal injury and massive property damage.

### XXXVII.

Defendant CPR made its decisions for the sole purpose of increasing profits and compensation of its executives and shareholders and at the expense and detriment of the public's safety, knowing all the while that their acts and omissions were wrongful and/or

13

likely to result in derailments which, in turn, cause death, severe personal injury and massive property damage.

### XXXVIII.

Plaintiffs have suffered serious personal injury, property damage, disability, impairment, medical expenses, lost income, lost productive time, unnecessary expenses and services, pain, suffering, economic and non-economic losses, for which they are entitled to compensation, having a value to be determined by the finder of fact.

### XXXIX.

Plaintiffs allege that the acts or omissions of Defendant CPR warrant a finding for exemplary or punitive damages as determined by the finder of fact. Defendant CPR is put on notice that leave of court will be sought to amend these pleadings to assert a claim for exemplary or punitive damages.

**THE PLAINTIFFS REALLEGE ALL ALLEGATIONS SET FORTH PREVIOUSLY IN THIS COMPLAINT AS TO EACH COUNT HEREINAFTER STATED AS THOUGH EACH ALLEGATION WERE SET FORTH IN EACH COUNT**

### COUNT ONE

### I.

The Minot Derailment was directly and proximately caused as a result of the negligence, gross negligence, carelessness, recklessness and willful, wanton, intentional and deliberate acts and omissions of the Defendant CPR.

### II.

Defendant CPR acted with willful indifference, and deliberate and conscious disregard for the rights and safety of others by failing to properly inspect, maintain, replace and repair its tracks; by increasing track usage beyond that which the track could reasonably handle; by operating the train at the Minot Derailment in excess of track speed

14

or in excess of a reasonable speed; by refusing to install and maintain signal in the territory; by refusing to adequately provide maintenance crews; improper allocating of resources; inadequate or lack of supervision or direction of employees and equipment; and other acts which caused its equipment to deteriorate into and remain in a defective and dangerous condition in close proximity to populated areas with full knowledge of the consequences of its acts and/or omissions which included the probability of death, serious personal injury and massive property damage from train derailments.

III.

Defendant CPR is guilty of one or more of the following acts of negligence, carelessness, recklessness, and deliberate acts with willful indifference and reckless and conscious disregard to the rights and safety of others, including the Plaintiffs:

A.      Failure to adopt, install, implement, train and enforce a safe method and procedure for the proper inspection, maintenance, upkeep and repair of the tracks, road bed, rails and equipment at the time and location of the Minot Derailment;

B.      Failure to properly construct, inspect, maintain and repair the tracks, road bed, rails and other property including equipment and lading;

C.      Failure to properly supervise, regulate and operate in North Dakota the safe movement of its engines, cars and lading;

D.      Negligent operation of CPR train designated 292-16;

E.      Failure to properly construct, inspect, repair and maintain the tracks, including the failure to hire or maintain a sufficient workforce to adequately and safely maintain the tracks when Defendant CPR knew the tracks were carrying hazardous, toxic, explosive, dangerous and ultra-hazardous material on tracks which are near people's

15

homes while knowing that there was a high degree of probability, if not certainty, of death, serious personal injury and/or property damage;

      F.     Substantially increasing traffic loads on the Kenmare Section, while at the same time installing numerous plugs or other repairs, curtailing or discontinuing welding and discontinuing use of inspections intended to find cracked or broken joint bars, on track that Defendant CPR knew or should have known could not handle the loads, usage or speeds imposed;

      G.     Failing to install a signal system which would notify Defendant CPR in the event of breaks or pull-aparts of its track;

      H.     Discontinuing the use of devices intended to identify cracks or breaks in joint bars;

      I.     Delaying, severely curtailing or discontinuing welding of joints for unreasonable lengths of time, even in the face of joint problems discovered and known to exist, or which should have been discovered;

      J.     Knowing of and ignoring, or purposefully ignoring, or implementing procedures and practices which Defendant CPR knew full well would not disclose or would allow dangerous or defective conditions to exist in its track which amount to purposeful avoidance of information affecting public safety and including inadequate training of personnel, non-measurement of rail end batter, inadequate, unmeasured torquing of bolts, excessive spacing between rail end and plug, non-walking inspections, non-use of ultrasonic joint bar testing devices, use of old, worn, deficient rail, improperly reusing rail, mismatching rail height, inadequate anchoring, ignoring bent, damaged nuts and bolts, inadequate or non-existent record keeping, unreasonably delaying of welding

of joints, and other acts representing a conscious disregard of facts or a conscious disregard of the likelihood of facts; and

K.    Failing to adopt, implement and comply with necessary and required policies and procedures as required by state and federal law, and further failing to comply with requirements of state and federal law including, but not limited to, requirements of the FRA and CFR.

L.    Other acts of negligence, carelessness, recklessness, willful, wanton and intentional and deliberate acts or failure to act which caused the Minot Derailment and, consequently, the damages suffered by the Plaintiffs.

## COUNT TWO

### IV.

Defendant CPR engaged in, at the time of the Minot Derailment, an ultra-hazardous or extra-hazardous activity, as defined by Minnesota law or the applicable law, and is strictly liable to the Plaintiffs for the damages suffered by the Plaintiffs while engaging in such activity.

## COUNT THREE

### V.

The Defendant CPR violated applicable state law, both North Dakota and Minnesota, as well as United States law, resulting in the release of hazardous substances and which amount to contamination, pollution, unauthorized release of hazardous material and other violations of applicable "environmental laws" and for which Defendant CPR is strictly liable for damages occasioned thereby, including, but not limited to, personal injury, property damage, statutory penalties, actual attorney's fees, and other damages as specified in applicable environmental laws.

17

## COUNT FOUR

### VI.

The acts and omissions of Defendant CPR created a nuisance by the release of anhydrous ammonia, which damaged the Plaintiffs for which Plaintiffs are entitled to recover damages and all other remedies at law.

## COUNT FIVE

### VII.

Defendant CPR caused, allowed, or otherwise permitted lading under its exclusive control and direction to trespass onto the property and person of the Plaintiffs, resulting in damages to the Plaintiffs and their property for which Defendant CPR is liable.

## COUNT SIX

### VIII.

Defendant CPR was engaged in an abnormally dangerous activity: the transportation of hazardous material in populated areas. As such, Defendant CPR is subject to liability for harm to persons and property resulting from such activities even if Defendant CPR exercised the utmost care being strictly liable for damages suffered by the Plaintiffs.

## COUNT SEVEN

### IX.

Defendant CPR is liable to the Plaintiffs for their damages as the result of CPR's breaches of statutory rules and regulations including, but not limited to, violations of FRA rules and regulations, violations of the Code of Federal Regulations, violations of Defendant CPR's standard practice circulars and other applicable state or federal law or

administrative regulatory agencies of the states of North Dakota and Minnesota and the United States government.

### JURY TRIAL DEMANDED

Plaintiffs demand trial by the maximum number of jurors permitted by law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief against Defendant CPR for damages for pain, suffering, disability, impairment, personal injury, property damage, economic and non-economic damages, mental anguish and all other damages proximately caused by Defendant CPR's wrongful acts or omissions for which Plaintiffs are entitled to compensation in an amount exceeding $50,000.00, together with attorney's fees, costs, disbursements herein, and penalties provided by applicable law, and for such other and further relief as the court deems just and equitable.

Dated this 28th day of June, 2004.

BY:        Collin P. Dobrovolny (ND License #03295)

           Bryan J. Van Grinsven (ND License #05357
           And MN License #0261312)

           MCGEE, HANKLA, BACKES &
           DOBROVOLNY, P.C.,
           15 2nd Avenue SW – Wells Fargo Bank Center
           PO Box 998
           Minot, ND  58702-0998
           Telephone No. (701) 852-2544
           ATTORNEYS FOR PLAINTIFFS

19

**BRIGGS** AND **MORGAN**

PROFESSIONAL ASSOCIATION

2200 FIRST NATIONAL BANK BUILDING
332 MINNESOTA STREET
SAINT PAUL, MINNESOTA 55101
TELEPHONE (651) 808-6600
FACSIMILE (651) 808-6450

WRITER'S DIRECT DIAL

(651) 808-6606

WRITER'S E-MAIL

kdecker@briggs.com

RECEIVED

04 JUL 15 PM 4:29

CLERK, U.S. DIST. COURT
ST. PAUL, MN

July 15, 2004

Clerk of Court
United States District Court
708 Federal Building
316 North Robert Street
St. Paul, MN 55101

Re:     **Tom Lundeen, et al. v. Canadian Pacific Railroad, et al.**
        **Court File No. _____**

Dear Sir or Madam:

Enclosed for filing, please find the Civil Cover Sheet and Notice of Removal with reference to the above entitled matter, along with our Affidavit of Service. Also enclosed, please find our check in the amount of $150.00 to cover the filing fee.

Please call me at the above number with any questions.

Sincerely,

Kevin M. Decker

KMD/bba
Enclosures
cc:     Collin P. Dobrovolny
        Bryan L. Van Grivsven